DOROTHY COOPER, COMPLAINANT, v. JOHN COOPER, DEFENDANT.

Decided August 14, 1933.

Before Judge JOSEPH SIEGLER.

For the complainant, *Paula Laddey.*

For the defendant, *C. Wallace Vail.*

SIEGLER, J. This is an action brought by Dorothy Cooper, charging that John Cooper, her husband, has, since February, 1933, failed to support her and their minor child, three and a half years of age, and praying that she be made an allowance for their support, pursuant to the provisions of "An act concerning the Juvenile and Domestic Relations Court," *Pamph. L.* 1929, *ch.* 157. The defendant replies and says that there is no marriage; that their relations were meretricious; and that there was no intention to regard their relationship as marital. The complainant answers that by saying that they had agreed between them to be husband and wife and thereby have established a common-law marriage.

These parties met some time early in August, 1929, and immediately thereafter started to cohabit with each other, resulting in the birth of a child in July, 1930. Shortly after the commencement of the marital relations between these parties, both of them moved to Jersey City, where they lived on West Side avenue in a furnished apartment and became known there as Mr. and Mrs. Cooper. Mrs. Peterson, the mother of the complainant, visited this couple at their Jersey City abode during the month of May, 1930, during which

visit the defendant made admissions and declarations to her that he was married to her daughter and that the marriage had taken place in September, 1929. Mrs. Peterson on several occasions asked for the marriage certificate of the complainant, which neither of these parties was able to furnish, but they succeeded each time in explaining away non-production.

Just before the birth of the first child, because of a quarrel between these parties, the defendant went to live with his parents in Trenton, New Jersey; the complainant, with her mother, Mrs. Peterson. The defendant communicated with the complainant by a letter during this time, represented by *Exhibit C-4*. This letter was admitted by the defendant to be in his writing, and was dated June 4th, 1930. In it he addresses the complainant as "dearest darling wife." It goes on further to say: "I really hope you will forgive me for the things I said to you I was so mad that I must be out of my mind I love you more than life itself." He closes this letter: "Your husband and all his love, Jack."

Their child was born on the 5th of July, 1930. On the birth certificate, marked in evidence as *Exhibit C-1*, appears the name of the child, "John William Cooper" (the same name as the defendant's). Immediately after the birth of this child, the parties herein resumed living with each other, this time at 309 Bloomfield avenue, Montclair, New Jersey. The defendant was employed at that time with Mr. Kripple (by the way, he was not produced as a witness in this case, nor was his non-production explained), and it is said, and not denied, that they were known to him as husband and wife. In August, 1930, the defendant left his wife again, and went to live at Claremont avenue, Verona. At this point, the complainant introduced in evidence, without objection by the defendant, *Exhibit C-2,* which purports to be a public notice, published in the newspapers, in which he says:

"I hereby give notice that I will not be responsible for any bills or debts incurred by my wife, Mrs. J. Cooper, with whom I am no longer living.

JACK COOPER,
135 Claremont Ave."

The parties make up their differences again, and are apparently living in peace and happiness, on September 13th, 1930, on Claremont avenue, Verona, and continue to live there together as husband and wife until November 7th, 1930, when their child died. After this sad occurrence, the defendant leaves the complainant, shifting for himself, and leaving the complainant to get along as best she could; and this separation continues until December, 1931. Again, at this point, *Exhibit C-3* is introduced in evidence by the complainant, without any objection by the defendant. This exhibit purports to be an envelope in the handwriting of the defendant, postmarked "Trenton Nov 27 10 PM 1931," and addressed:

"Mrs. Dorethy Cooper
142 Elmwood Road
Verona
N. J.
% Mrs. McCoy."

The letter which came in the envelope was not produced. However, this latter correspondence resulted in a meeting between the parties at an appointed place and time, when they again decided to take up living together, and located at Lincoln and Williams Streets, East Orange, in a furnished room. The complainant says that she lived there with him as husband and wife and that she was introduced to Mrs. Harrison and to Theresa Wright as his wife. The introduction and holding out as husband and wife was denied by the defendant. I heard the testimony of Mrs. Harrison and Mrs. Wright. I was satisfied that the testimony of Mrs. Wright that they lived there as husband and wife and that the defendant did introduce the complainant to her as his wife and "my better half," is creditable evidence and the truth of this happening. Even without this admission and the statement of Mrs. Harrison, it stands undenied that complainant and defendant occupied and enjoyed a furnished room together in these premises. They were together until some time in December, 1932, and separated then for the last time. Another child was born on February 5th, 1933, for which support is asked in these proceedings.

Mrs. Peterson, the mother of complainant, in substance corroborates the daughter in places where they lived and times when they separated and what happened at the time of the birth of the children. At all the places where she visited, she found them living together as husband and wife. She says that the defendant's father came to visit them at their house and was present when the defendant introduced Dorothy (this complainant) to his father: "I want you to meet my wife, Dorothy." She saw Jack and Dorothy come out together from Mrs. Wright's house in the months of July and August, 1932.

Chief of Police Rowland, of Verona, says he knew these parties, having come in contact with them in the discharge of his public duties. He says that they were known to him and in the community as Mr. and Mrs. Cooper.

Mrs. Jennie Hermann says that the defendant told her about his wife three years ago. The defendant then worked in the meat market where she was a customer; that he (the defendant) also told her at one time: "I am going to save up and get a divorce."

Mrs. Harrison, a defense witness, admits that they lived together at her furnished rooming house, and that when she (the complainant) first came to her door and asked of Mrs. Harrison whether Jack Cooper was there, the complainant told the witness that Jack Cooper was her husband.

The defendant himself claims that he just permitted the complainant to live with him without any responsibility to either one; that he never introduced her to his friends nor regarded her as his wife. He does admit, further, that complainant's mother always thought that they were married and that he did not tell complainant's mother that they were not married; that he told his own mother that he intended to marry the complainant. He admits that he complained before Chief of Police Rowland, of Verona, about his wife. The defendant also admits, on his recross-examination, that Mr. Kripple, one of his former employers, thought "Dorothy and I were married."

There was some testimony that complainant admitted being married to one Kenneth Harris. This was denied. There

being no evidence, either documentary or otherwise, to support this statement, I have given little credence to the truth of this statement. In any event, the purpose of this testimony was not to establish the truth of the statement made, but to attack the veracity of the complaining witness's testimony.

We come now to the question on which the decision of the case must turn; namely, is the defendant the husband of the complainant? Or, stated in another form, has the marriage on which the complainant's action rests been satisfactorily proved? The burden is on the complainant. Unless the case contains sufficient evidence to produce a clear conviction in the mind of the court that the parties entered into a contract of marriage some time in September, 1929, no relief can be awarded to the complainant. The complainant, therefore, must stand or fall upon this agreement. *Collins* v. *Voorhees,* 47 *N. J. Eq.* 315; 20 *Atl. Rep.* 676; *Pearson* v. *Howey,* 11 *N. J. L.* 12; *Blackburn* v. *Crawford's Lessee,* 3 *Wall* 175; 18 *L. Ed.* 186; *Bey* v. *Bey,* 83 *N. J. Eq.* 239; 90 *Atl. Rep.* 684 (at *p.* 692). The subsequent cohabitation, with matrimonial habit and repute, is nothing more than testimony in proof of the marriage. *Collins* v. *Voorhees, supra.*

In construing the contract, regard must be had to the intent of the parties as well as the manner in which the parties lived together during the period from 1929 until 1932. The testimony of the complainant strongly indicates that the agreement constituted a contract of marriage *per verba de præsenti.* The fact that a man and woman have openly cohabited as husband and wife for a considerable length of time, holding each other out and recognizing and treating each other as such by declarations, admissions, or conduct, and are accordingly generally reputed to be such among their relatives and acquaintances and those who come in contact with them, may give rise to a presumption that they had previously entered into an actual marriage, although there is no documentary evidence thereof, or direct testimony to that effect; and, in the absence of evidence in rebuttal, the presumption may be conclusive of the fact of marriage. But the

cohabitation must have been apparently matrimonial and continuing and regular, such as is usual between persons lawfully married, and the parties must have recognized and treated each other as husband and wife, holding each other out as such, so as to create the reputation that they are married. But reputation alone will not give rise to the presumption of marriage, and, where it is sought to raise the presumption of marriage from reputation coupled with cohabitation, the reputation must be general and not divided, and contemporaneous with the cohabitation, not subsequent to its termination.

The contract upon which the complainant rests her right to relief was made in the State of New Jersey. Its validity must, consequently, be determined by the law of this state. Now, there can be no doubt that if the parties made promises to each other, in the manner and of the kind sworn to by the complainant, according to the laws of this state, they became, by force of such promises, *eo instante,* husband and wife; and this would be the legal effect of such promises, whether they were exchanged in the presence of a witness possessing neither civil nor ecclesiastical authority, or in the absence of any witness whatever. The case of *Clark* v. *Clark,* 52 *N. J. Eq.* 650; 30 *Atl. Rep.* 81 (at *p.* 83), by Vice-Chancellor Van Fleet, adopts the language of Judge Folger in *Brinkley* v. *Brinkley,* 50 *N. Y.* 184, 197, where he said:

"The law is well settled that a man and woman, without the presence of a witness, without the intervention of minister or magistrate, by words of present contract between them, may take upon themselves the relation of husband and wife, and be bound to themselves and to society as such."

Vice-Chancellor Van Fleet further adopts the language from the opinion in *Clayton* v. *Wardell,* 4 *N. Y.* 230, 232, where Judge Harris, speaking for the majority of the court, said in substance that:

"Since the Reformation, marriage is no longer regarded as a sacrament, but as a civil contract. And like every other contract, all that is necessary for its validity is the deliberate consent of competent parties entering into a present agreement to take each for husband and wife. * * * And the

existence of a marriage contract is a fact which may be proved, like any other fact, either by positive evidence, or by evidence from which it may be inferred."

Further examination of the authorities in this state reveals that, in the case of *Jackson* v. *Jackson,* 94 *N. J. Eq.* 233 (at *p.* 236); 113 *Atl. Rep.* 495 (at *p.* 496), Vice-Chancellor Fielder, dealing with the question of what constitutes a common law marriage and the nature of proof required, says:

"Where there is no ceremonial marriage there must be an agreement entered into between the man and the woman, in words of the present tense, to live together as husband and wife. There are probably but few instances of mutual consent, by which each party in precise or unambiguous terms takes the other as spouse, but no particular words are necessary to declare an intention to enter into a contract of marriage. If from what was said by the parties, aided by the circumstances surrounding their entering upon their relationship, it can be gathered that they proposed to enter into a contract henceforth to live as husband and wife, it will be sufficient. *Stevens* v. *Stevens,* 56 *N. J. Eq.* 488; 38 *Atl. Rep.* 460; *Bey* v. *Bey,* 83 *N. J. Eq.* 239; 90 *Atl. Rep.* 684; *Schaffer* v. *Krestnovikow,* 88 *N. J. Eq.* 192; 102 *Atl. Rep.* 246; *affirmed,* 89 *N. J. Eq.* 549; 105 *Atl. Rep.* 239. And, where it appears that such relationship is matrimonial, rather than illicit, cohabitation and reputation will justify the presumption that the parties came together under a mutual promise to live as husband and wife. *Voorhees* v. *Voorhees, supra; Wallace's Case,* 49 *N. J. Eq.* 530; 25 *Atl. Rep.* 260; *Mullaney* v. *Mullaney,* 65 *N. J. Eq.* 384; 54 *Atl. Rep.* 1086."

We find, all through the decisions considering this type of problem, pronouncements of this well settled principle. The following cases seem to bear out this established doctrine: *Schaffer* v. *Krestnovikow,* 88 *N. J. Eq.* 523; 103 *Atl. Rep.* 240 (Court of Errors and Appeals), among other things, holds:

"The petitioner declared to the defendant that she was his wife, and thereafter the two, by habit, conduct, and declarations, held themselves out as husband and wife. We agree with the court below that these facts establish a lawful com-

mon law marriage, and it follows that the petitioner was not entitled to the relief which she sought."

In the case of *Maxwell* v. *Maxwell*, 98 *N. J. Eq.* 493 (at *p.* 500); 131 *Atl. Rep.* 215, Vice-Chancellor Griffin holds:

"In *Commonwealth* v. *Stump*, 52 *Pa. St.* 132 (at *p.* 136), Chief Justice Woodward said: 'Reputation and cohabitation, at best, are only presumptive proofs, and where either of these grounds fails, the court should not allow the presumption of marriage to be built upon the other.'

"In order to establish a presumption of a common law marriage by habit and repute, there must, not only be shown cohabitation, but reputation as husband and wife. Neither reputation without cohabitation, nor cohabitation without reputation, raises his presumption.

"*In re Yardley's Estate,* 75 *Pa. St.* 211, Chief Justice Agnew said: 'Neither cohabitation, nor reputation of marriage, nor both, is marriage. When conjoined, they are evidence from which a presumption of marriage arises.' He says, further: 'The Scotch expression conveys the true idea, perhaps, better than our own, "the habit and repute" of marriage. Thus, when we see a man and woman constantly living together, where one is dwelling there the other constantly dwells with him, we obtain the first idea or first step in the presumption of marriage, and when we add to this that the parties are constantly living together, are reputed to be man and wife, and so taken and received by all who know them both, we take the second thought or second step in the presumption of the fact of marriage. Marriage is the cause—these follow as the effect.' "

In the case of *Sturm* v. *Sturm,* 111 *N. J. Eq.* 579 (at *p.* 585; 163 *Atl. Rep.* 5 (Court of Chancery), Advisory Master Herr says:

"This presumption in favor of the legality of a marriage is one of the strongest known to the law, and its strength increases with the lapse of time, by the attitude of the friends, relatives and acquaintances of the parties, and by the birth of a child. To overcome it the evidence must be strong, distinct, satisfactory and conclusive (per Lord Lyndhurst in *Morris* v. *Davies,* 5 *Cl. & F.* 163; 7 *Eng. Reprint* 365); so

strong and persuasive as to leave no room for reasonable doubt.

" 'The law presumes morality and not immorality, marriage and not concubinage, legitimacy and not bastardy.' *Teter* v. *Teter*, 101 *Ind.* 129."

Further on in the same case, on page 588:

"In New Jersey no formal ceremony is essential to a valid marriage, and an agreement between the parties *per verba de præsenti* to be husband and wife constitutes a valid marriage; so that statutory provisions as to the formal solemnizing of marriages and the preliminaries thereto, and subjecting the official performing the ceremony to criminal punishment for omission of specified ceremonial requirements, are held to be directory merely, and not to affect the validity of marriages so performed. *Pearson* v. *Howey*, 11 *N. J. L.* 12; *Atlantic City Railroad Co.* v. *Goodin*, 62 *N. J. L.* 394; 42 *Atl. Rep.* 333; *State* v. *Thompson*, 76 *N. J. L.* 197; 68 *Atl. Rep.* 1068; *Applegate* v. *Applegate*, 45 *N. J. Eq.* 116; 17 *Atl. Rep.* 293; *Stevens* v. *Stevens*, 56 *N. J. Eq.* 488; 38 *Atl. Rep.* 460; *Mullaney* v. *Mullaney*, 65 *N. J. Eq.* 384; 54 *Atl. Rep.* 1086; *Bey* v. *Bey*, 83 *N. J. Eq.* 239; 90 *Atl. Rep.* 684; *Schaffer* v. *Kresnovikow, supra*."

In the case of *Keller* v. *Linsenmyer* (*Court of Chancery*), 101 *N. J. Eq.* 664 (at *p.* 674); 139 *Atl. Rep.* 33:

" 'The dissolution of the marriage relation is a proceeding which the law does not favor.' *Pinkinson* v. *Pinkinson*, 92 *N. J. Eq.* 669; 113 *Atl. Rep.* 143."

On page 678, Vice-Chancellor Fallon speaking:

"To establish a valid marriage it must appear that the parties are legally competent to contract with each other. In many cases it may be fairly found as an inference of fact that there was competency to contract marriage from evidence showing a marriage ceremony, legal in form, followed by cohabitation, birth of children, and a failure to question, on the part of anyone, the validity of the marriage thus entered into."

The court can look to the intent of the parties in construing the agreement. *Bey* v. *Bey*, 83 *N. J. Eq.* 239; 90 *Atl. Rep.* 684. Even though the relations between these parties

started meretriciously in August, 1929, these parties in September, 1929, were pledged to each other in holy matrimony. That the parties had sexual intercourse before the date of the alleged marriage is conceded. It was had, however, under circumstances that in no manner indicated a pretense before the world of an existing marriage relation. But, in September, 1929, an agreement was entered into, after which there was a complete change in their relations before the world. Thereafter their intercourse was connubial in its character, and continued unbroken and unquestioned for over three years, until the defendant deserted. This change in their mode of living, at least, when coupled with the agreement as testified to, overcomes any presumption that might arise against the validity of the marriage by reason of the meretricious beginning of their relations. In any event, the presumption against the marriage is not very strong, because they did not cohabit meretriciously. *Bey* v. *Bey*, 83 *N. J. Eq.* 239; 90 *Atl. Rep.* 684.

Let us examine the evidence and judge these parties by what they did and said. When they first went to live together at Jersey City, they assured complainant's mother that they were married in September, 1929; and, again, when the first child was born, defendant, by his conduct, indicated that it was his child, the result of his matrimonial relations with the complainant. The birth certificate fortifies the truth of that fact. At least, he never denied or repudiated the child or the circumstances from which these inferences are drawn. He declared to his own parents, on various occasions, by way of introduction of the complainant to them as his wife. He says that Mr. Kripple, his former employer, understood that he was living with the complainant as husband and wife, or that the complainant was his wife; in his letter to his wife referred to above, there appears to be no question at all as to whether or not the complainant was his wife; he refers to her in very endearing terms; in writing to her, he addressed her as "Mrs. Cooper." His declarations to Mrs. Hermann, his introduction of the complainant to Mrs. Wright, as his wife, his dealing with her as husbands usually deal with their wives, the birth of children and the recognition that they were their

children or the fruit of their marriage—all is evidence which corroborates the fact that there was an agreement of marriage between these parties and that, in that agreement, they solemnly pledged each other that they would be husband and wife unto each other. The explanation by the defendant that he never intended his relations with the complainant to be regarded as a marriage, in the face of the facts presented here, is ridiculous, and certainly falls far short of overcoming the strong presumptions that arise in favor of the complainant, and hardly comes anywhere near meeting the presumption. Where a man assumes the responsibilities that a married man usually does, to provide support and a place of abode, furnishes the money for the support and maintenance of his children, cares for them, declares to persons through introductions, that the woman is his wife, addresses her as such, deals with her as such, tells relatives, acquaintances, and others to do likewise, he cannot be permitted to come in, after he becomes tired, discouraged, or disappointed with his bargain, to repudiate it because there appears to be no ceremonial marriage between them. This would make a mockery out of the solemn and sacred status of marriage.

The presumption in favor of the legality of marriage increases with the lapse of time, by the attitude of friends, relatives and acquaintances of the parties, and by the birth of children. All of these things the defendant indulged in and permitted to continue. He heralded the complainant to the world as his wife and the children that she bore and delivered into the world as their children, the result of their matrimony. Having allowed these things to proceed in their natural course and to become known to all those with whom he and the complainant came in contact and relied upon, only evidence so strong and persuasive as to leave no room for reasonable doubt is capable of overcoming the presumptions that flow from such a state of facts.

From all the facts in this case, I am satisfied that the complainant has conclusively proved that the complainant and the defendant became husband and wife in September, 1929, and that complainant is, therefore, entitled to an allowance for maintenance and support of herself and her child. I order $8 a week.